UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| HUSNIJA KARAHASANOVIC, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 4:14 CV 710 DDN |
| CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Husnija Karahasanovic for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, 1381. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff was born on January 12, 1958. (Tr. 22.) He filed his applications on August 18, 2011. (Tr. 8, 35-36, 89, 96, 100.) He alleged an onset date of August 31, 2009, and alleged disability due to post traumatic stress disorder (PTSD), depression, back and joint pain, and headaches. (Tr. 152.) Plaintiff's applications were denied initially, and he requested a hearing before an ALJ. (Tr. 38-43.)

On March 18, 2013, following a hearing, the ALJ issued a decision that plaintiff was not disabled. (Tr. 8-17.) On February 7, 2014, the Appeals Council denied plaintiff's

request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

On September 29, 2000, plaintiff was seen in the emergency room at UC San Diego Healthcare in San Diego, California, and diagnosed with diabetes and a back muscle or ligament strain. (Tr. 185-86.)

On June 20, 2011, plaintiff was seen at Smiley Urgent Care/St. Louis Connectcare for a skin abscess on his buttocks that was approximately 4 centimeters in diameter. The cyst was drained and dressed, and Bactrim, an antibiotic, was prescribed. He was diagnosed with cellulitis, a common skin infection that occurs when bacteria spread through the skin to deeper tissues. (Tr. 178, 198-99.)

On November 18, 2011, a consultative exam was performed by Lloyd Irwin Moore, Ph.D. Plaintiff reported that he completed high school in Yugoslavia and that he had five living siblings. He had been a POW, and had been tortured and witnessed many atrocities. His current activities included staying at home to look after his mentally ill son, and occasionally walking outside in his yard. He did not have any friends and did not socialize because his mood prevented this. Mental status examination revealed that he was oriented in all spheres but appeared depressed and somewhat nervous. His mood was dysthymic, i.e., displaying a mild but long-term (chronic) form of depression. Dr. Moore diagnosed with Major Depressive Disorder (MDD), PTSD, and assigned a GAF score of 55, indicating moderate symptoms. Dr. Moore believed that plaintiff had moderate impairments in activities of daily living, social functioning, concentration, persistence, and pace. (Tr. 203-06.)

On November 18, 2011, Inna Park, M.D., performed an internal medicine consultative exam. Physical exam revealed tenderness in the cervical and lower lumbar spine with muscle tenderness in the muscles of the lumbar region as well as the right

gluteal region. Dr. Park's impression was back pain with radiculopathy (pain radiating from the spine), joint pain in both hands, and evening headaches. (Tr. 209-12.)

On November 23, 2011, Robert Cottone, Ph.D., completed a mental Residual functional Capacity (RFC), indicating that plaintiff was markedly limited in the ability to understand and remember detailed instructions and to carry out detailed instructions. He was moderately limited in the ability to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. Cottone believed that plaintiff could remember, carry out and persist at simple tasks, make simple work-related judgments, relate adequately to co-workers and supervisors, and adjust adequately to ordinary changes in work routine or setting. He opined that plaintiff must avoid work involving intense or extensive interpersonal interaction, handling complaints or dissatisfied customers, close proximity to co-workers, and close proximity to military settings. (Tr. 228-30.)

On January 4, 2012, plaintiff saw Mirela Marcu, M.D., a psychiatrist, for increased symptoms of traumatic injuries over the last year. He reported depression, decreased interest in doing things, decreased energy, and difficulty sleeping with nightmares. Dr. Marcu's mental status evaluation revealed a depressed mood and a congruent affect, passive death wishes, and paranoia. She diagnosed PTSD, MDD, and assigned a GAF score of 50, indicating serious symptoms. Plaintiff agreed to begin therapy and medication. Dr. Marcu prescribed Celexa, an antidepressant, and Ambien, for insomnia. (Tr. 231-36.)

On January 5, 2012, plaintiff saw Ginger Fewell, M.D., for follow up for his gluteal abscess that had been irrigated and debrided the previous month. Dr. Fewell's assessment was constipation and a generalized anxiety disorder. (Tr. 265-66.)

At a follow up appointment with Dr. Marcu on February 8, 2012, plaintiff reported sleeping eleven to twelve hours per night as a side effect of the Ambien and waking up and feeling tired. His mood was a little better but he was still depressed. Dr. Marcu discontinued his Ambien, started trazodone, an antidepressant, and continued Celexa. (Tr. 237.)

Plaintiff saw Dr. Marcu again on April 18, 2012. Plaintiff reported that his anxiety and sleep were a little better although he was having nightmares. He reported sadness, anxiety, isolation, and being bothered by noises. He was very upset about his son who had schizophrenia. He had not started on trazodone because his pharmacy did not carry the prescribed strength. Dr. Marcu also diagnosed Adjustment Disorder due to his son's mental illness. (Tr. 238.)

Plaintiff saw Dr. Marcu again on June 6, 2012. He was feeling a little better, sleeping eight to nine hours per night, but was still having nightmares, waking up frequently, and difficulty falling asleep. His care was being transferred to another psychiatrist, Jaron Asher, M.D. (Tr. 239.)

On August 23, 2012, plaintiff saw Dr. Asher. He was sleeping four to six hours per night. Dr. Asher increased his trazodone and diagnosed prolonged posttraumatic stress. (Tr. 260-64.)

In November 2012, plaintiff was seen several times for the gluteal abscess which had recently worsened. The abscess continued to heal but would require surgery. He was referred to a general surgeon who could see him without insurance. (Tr. 242-58.)

On December 20, 2012, plaintiff saw Dr. Asher, reporting feeling frightened and anxious for the past month. He reported that increasing his trazodone had improved his sleep. He reported that he had not worked in two years, that he had a son who was sick, and that everything is "hard on him." (Tr. 281.) Mental status exam revealed that his

mood was a little anxious, and foot tapping was noted.  Dr. Asher continued his trazodone and increased his Celexa.  (Id.)

A Function Report Adult-Third Party completed by Sanel Bejdic, plaintiff's case worker, indicated that plaintiff had difficulty sleeping because of bad dreams about war trauma.  He had difficulty putting his socks and shoes on and with shaving because his hands shook.  Mr. Bejdic reported that plaintiff's wife handled their financial matters due to plaintiff's lack of focus and depression.  He further reported that plaintiff has difficulty with lifting, squatting, kneeling, and reaching.  He also had difficulty with memory, concentration, completing tasks, and understanding and following instructions.  (Tr. 131-35.)

**ALJ Hearing**

The ALJ conducted a hearing on January 16, 2013.  (Tr. 21-40.)  Plaintiff appeared and testified to the following with the aid of a Bosnian interpreter.  He lives with his wife and disabled son, who is 28 years old.  He was born on January 12, 1958 in Bratunac, Bosnia and Herzegovina.  He came to the United States in 2000 and became a citizen in May 2012.  He completed high school in Bosnia.  He can read and write in Bosnian, and read and write very little English.  He can lift two gallons of milk before experiencing back pain.  He can stand for approximately thirty minutes at a time, and walk 150 meters without having to stop.   It is very difficult for him to do anything that requires bending, such as showering and dressing.  He can no longer cook at home or do basic chores such as vacuuming. His wife does the laundry.  (Tr. 24-27.)

 He spent seven or eight days in a POW camp during the Bosnian War where he was separated from his family and beaten.  He still thinks about his experience in the camp and cannot remove those pictures from his mind.  He has nightmares about the war two or three times per week despite taking medication. He has difficulty with his memory and was late to a doctor's appointment the day before due to his difficulty with memory. (Tr. 27-29.)

He avoids people and prefers to be by himself. He has crying spells triggered by memories of the POW camp. His crying spells occur many times a day and last for fifteen to twenty minutes, and are triggered by his own medical and mental problems and his disabled son. (Tr. 29-30.)

He has daily constant low level back pain and takes Ibuprofen and uses a cream, both of which work temporarily. Once or twice a week he has pain in his back that radiates into his right hip and down his right leg. His doctors have advised him that he has diabetes. However, he does not have health insurance and cannot get treatment for his diabetes or his gluteal abscess. (Tr. 30-31.)

**Decision of the ALJ**

On March 18, 2013, the ALJ issued an unfavorable decision. The ALJ found that plaintiff had not engaged in substantial gainful activity since August 31, 2009, his alleged onset date. The ALJ found that plaintiff had the severe impairments of low back pain, major depressive disorder, and PTSD. However, the ALJ found that he did not have an impairment or combination of impairments listed in or medically equal to one contained in the Listings, 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 10-12.)

The ALJ determined that plaintiff retained the RFC to perform light work, except that he was limited to simple tasks, could not work in close proximity to others, and could not perform tasks involving intense or extensive interpersonal interaction. (Tr. 13.) The ALJ found that plaintiff's impairments would not preclude him from performing his past relevant work (PRW) as a cleaning or maintenance worker. (Tr. 16.) Consequently, the ALJ found that plaintiff was not disabled within the meaning of the Act. (Tr. 16.)

### III. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d

935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## IV. DISCUSSION

Plaintiff argues that the ALJ erred in failing to give "great weight" to the opinion of his treating psychiatrist, Dr. Mirela Marcu, and in failing to obtain Vocational Expert (VE) testimony. This court disagrees.

### A. Opinion of treating psychiatrist, Mirela Marcu, M.D.

Plaintiff argues that the ALJ erred in failing to give "great weight" to the opinion of his treating psychiatrist, Mirela Marcu, M.D. Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. See 20 C.F.R. § 416.927(c)(1)-(2). However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. See Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007). Likewise, an ALJ may appropriately rely on non-examining opinions as part of his RFC analysis. See Hacker v. Barnhart, 459 F.3d 934, 935, 939 (8th Cir. 2006) (ALJ's RFC assessment was supported by substantial evidence, including the opinions from non-examining doctors). Ultimately, it is up to the ALJ to determine the weight each medical opinion is due. Id.

In this case, the ALJ properly considered the opinion of Dr. Marcu. The ALJ summarized Dr. Marcu's course of treatment, noting that it consisted of only four visits between January and June 2012. (Tr. 11, 231-39.) In January 2012, Dr. Marcu initially diagnosed plaintiff with PTSD and MDD. She assigned a GAF score of 50 and prescribed an antidepressant and sleep aid. In April and June 2012, Dr. Marcu reported plaintiff was doing better, experiencing less anxiety and sleeping better. Although plaintiff had a depressed and constricted affect, he was pleasant, with fair eye contact. (Tr. 236-39.)

The ALJ gave no weight to the GAF score assigned by Dr. Marcu, finding that the GAF score was not consistent with the record as a whole and because the medical record evidence did not support such severity. The ALJ noted that in November 2011, prior to the initial denial of plaintiff's applications and before plaintiff sought mental health treatment, a mental status examination revealed normal speech, calm motor activity, and

blunted but sometimes labile (rapidly changing) and depressed mood. The ALJ noted that at that time, plaintiff's thought processes were intact, he had no delusions or thought disorders, his judgment was good, and his insight was fair, although he was pessimistic. (Tr. 11, 38, 205.) In November 2011, the consultative examiner opined that plaintiff had only moderate impairments in his activities of daily living, social functioning, and concentration, consistence, and pace. He assessed a GAF score of 55. (Tr. 206.)

The ALJ was entitled to question the inconsistency between the consultative examiner's opinion and GAF score and that of Dr. Marcu. See Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004) (ALJ need not need to give controlling weight to physician's RFC assessment if it is inconsistent with other substantial record evidence). Similarly, the ALJ also noted that Dr. Marcu's GAF score was not supported by plaintiff's treatment notes. See, e.g., Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010) (permissible for ALJ to discount treating physician's opinion that is inconsistent with the physician's treatment notes).

The ALJ noted that Dr. Marcu assessed plaintiff's GAF score before he started medication and that Dr. Marcu noted that plaintiff's condition improved while on medication. (Tr. 11, 15, 238-39.) "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)); see also Perkins v. Astrue, 648 F.3d 892, 901 (8th Cir. 2011) (a determination that an illness is well controlled with medication precludes a finding of disability).

To the extent plaintiff is relying on the GAF scores assigned by Dr. Marcu, according to the Diagnostic and Statistical Manual of Mental Disorders (DSM-V), the GAF scale is intended for use by practitioners in making treatment decisions. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed.-Text Revision 2000) (DSM-IV). However, the most recent version of the DSM dropped GAF from inclusion because of its "conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." DSM-V 16 (5th ed. 2013).

Moreover, neither Social Security regulations nor case law require an ALJ to determine the extent of an individual's mental impairment based solely on a GAF score. In fact, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." See 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (August 21, 2000).

While the Commissioner has declined to endorse the GAF scale for use in the Social Security and SSI disability programs, GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning. Halverson, 600 F.3d at 930-31 (GAF score may be of considerable help in formulating RFC, but is not essential to RFC's accuracy). GAF scores may also be considered by the ALJ when considering weight to be given treating doctor's opinion and whether the doctor's opinion is inconsistent with treatment record. Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013). In Pate-Fires, the Eighth Circuit held that because the claimant's GAF score was above 50 only four out of twenty-one times in a six-year period, the history of GAF scores at 50 and below, taken as a whole, indicated serious symptoms and supported the treating physician's opinion that the claimant was not capable of gainful employment. 564 F.3d at 944. In this case plaintiff has not presented a "GAF score history" similar to Pate-Fires. Moreover, the ALJ here relied heavily on other record evidence in reaching his conclusions. Finally, the Eighth Circuit has since noted that the court in Pate–Fires did not reference 65 Federal Regulation 50746, 50764–65 (August 21, 2000), in which the Commissioner declined to endorse the GAF scales to evaluate Social Security claims because the scales do not have a direct correlation to the severity requirements in mental disorders listings. Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010). Therefore, because there is no direct correlation between plaintiff's GAF scores and a mental impairment's severity, and the ALJ has no obligation to credit or even consider GAF scores in the disability determination, plaintiff's reliance on his GAF scores is without merit.

The ALJ here also noted that plaintiff did not seek treatment for his mental impairment until after his initial applications for benefits were denied. (Tr. 14.) The ALJ was entitled to consider plaintiff's eleven-year delay in seeking treatment. Cf. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) (ALJ may discount a claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment; ALJ correctly concluded that if claimant's pain was as severe as alleged, claimant would have sought regular medical treatment).

Because the ALJ articulated the reasons for discounting Dr. Marcu's GAF score, and because substantial evidence in the record as a whole supports those reasons, this Court holds the ALJ committed no error.

### A. Vocational Expert Testimony

Plaintiff next argues that the ALJ erred in failing to obtain VE testimony in light of the evidence of his nonexertional impairments, i.e., his PTSD and depression.

Residual functional capacity is a determination based on all the record evidence, not just the medical evidence. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010); see also 20 C.F.R. §§ 404.1545 and 416.945; Social Security Ruling (SSR) 96-8p. Although the RFC formulation is a part of the medical portion of a disability adjudication, as opposed to the vocational portion, it is not based only on "medical" evidence. Rather an ALJ has the duty to formulate RFC based on all the relevant, credible evidence of records. See Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."). see also 20 C.F.R. §§ 404.1545, 404.1546, 416.945, and 416.946; SSR 96-8p. Substantial evidence supports the ALJ's finding.

In this case, the ALJ found that plaintiff retained the RFC to perform light work, except that he was limited to simple tasks, could not work in close proximity to others, and could not perform tasks involving intense or extensive interpersonal interaction. (Tr.

13.) The ALJ found that plaintiff's impairments would not preclude him from performing his PRW as a cleaning or maintenance worker. (Tr. 16.)

Because plaintiff retained the ability to return to his PRW, the burden of proof at Step Four of the evaluative process was his. See 68 Fed. Reg. 51155 (Aug. 26, 2003) (plaintiff shoulders the dual burdens of production and persuasion through Step Four of the sequential evaluation process); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000) (claimant has the burden of proof at Step Four).

In support, plaintiff cites McDonald v. Schweiker, 698 F.2d 361 (8th Cir. 1983), for the proposition that his nonexertional impairments required the ALJ to obtain VE testimony to determine whether he was disabled. However, in McDonald, the ALJ found that the claimant could no longer perform her PRW and was ultimately decided at Step Five of the sequential analysis. 698 F.2d at 364-65. In contrast, no VE testimony was necessary in this case because the ALJ decided at Step Four that plaintiff could return to his PRW. When the ALJ determines at Step Four that a claimant can perform his PRW, he is under no obligation to seek additional information from a VE. See Lewis v. Barnhart, 353 F.3d 642, 648 (8th Cir. 2003) (VE testimony is not required at Step Four where the claimant retains the burden of proving she cannot perform her PRW). This is true even where a claimant has nonexertional impairments. See, e.g., Banks v. Massanari, 258 F.3d 820, 827-28 (8th Cir. 2001) ("Vocational expert testimony is not required until Step Five when the burden shifts to the Commissioner, and then only when the claimant has nonexertional impairments, which make use of the medical vocational guidelines, or 'grids,' inappropriate."). Accordingly, this court concludes the ALJ committed no error.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

S/   David D. Noce<br>
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 21, 2015.